UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| NATIONAL ASSOCIATION OF HOME BUILDERS OF THE UNITED STATES, et al.<br><br>　　　　　　　　Plaintiffs,<br><br>v.<br><br>MONTOMERY COUNTY, MARYLAND,<br><br>　　　　　　　　Defendant. | Case No. 8:24-cv-03024-PX |

**UNITED STATES OF AMERICA'S STATEMENT OF INTEREST**

## **TABLE OF CONTENTS**

TABLE OF CONTENTS ................................................................................................................. i

TABLE OF AUTHORITIES .......................................................................................................... ii

INTRODUCTION .......................................................................................................................... 1

BACKGROUND ............................................................................................................................ 1

DISCUSSION ................................................................................................................................. 3

CONCLUSION ............................................................................................................................. 15

## TABLE OF AUTHORITIES

**Cases**

*Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n*,
   410 F.3d 492 (9th Cir. 2005) .................................................................................. 5

*Am. Pub. Gas Ass'n v. U.S. Dep't of Energy*,
   22 F.4th 1018 (D.C. Cir. 2022) ................................................................................ 2

*Bldg. Indus. Ass'n of Wash. v. Wash. State Bldg. Code Council*,
   683 F.3d 1144 (9th Cir. 2012) ................................................................................. 5

*California Restaurant Ass'n v. City of Berkeley*,
   89 F.4th 1094 (9th Cir. 2024) ........................................................................ *passim*

*CSX Transp., Inc. v. Easterwood*,
   507 U.S. 658 (1993) ................................................................................................ 4

*Dubin v. United States*,
   599 U.S. 110 (2023) .............................................................................................. 13

*Goodyear Atomic Corp. v. Miller*,
   486 U.S. 174 (1988) .............................................................................................. 10

*Hunton & Williams v. U.S. Dep't of Justice*,
   590 F.3d 272 (4th Cir. 2010) ................................................................................... 1

*Just Puppies, Inc. v. Brown*,
   123 F.4th 652 (4th Cir. 2024) .................................................................................. 4

*Maryland v. Louisiana*,
   451 U.S. 725 (1981) ................................................................................................ 4

*Nat'l Credit Union Admin. v. First Nat'l Bank & Tr. Co.*,
   522 U.S. 479 (1998) .............................................................................................. 14

*New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*,
   514 U.S. 645 (1995) ................................................................................... 4, 11, 13

*Rice v. Santa Fe Elevator Corp.*,
   331 U.S. 218 (1947) ................................................................................................ 4

*Steel Co. v. Citizens for a Better Env't*,
   523 U.S. 83 (1998) .................................................................................................. 1

*United States v. Perkins*,
   67 F.4th 583 (4th Cir. 2023) .................................................................................. 10

*Van Buren v. United States*,
   593 U.S. 374 (2021) .................................................................................................... 12

*Wash. State Dep't of Soc. & Health Servs. v. Guardianship Estate of Keffeler*,
   537 U.S. 371 (2003) .................................................................................................... 14

*Whitman v. Am. Trucking Ass'n*,
   531 U.S. 457 (2001) .................................................................................................... 11

**Statutes**

28 U.S.C. § 517 ................................................................................................................... 1

42 U.S.C. § 6291 ........................................................................................................ *passim*

42 U.S.C. § 6293 ............................................................................................................... 12

42 U.S.C. § 6295 ................................................................................................................. 2

42 U.S.C. § 6297 ........................................................................................................ *passim*

42 U.S.C. § 6297 (1982) .................................................................................................... 7

Inflation Reduction Act of 2022, Pub. L. No. 117-169, 136 Stat. 1818 (2022) .............. 9

Montgomery Cnty. Code § 8-14D .............................................................................. 3, 9

**Rules**

*Energy Conservation Program for Consumer Products; Final Rule for Clothes Dryers and Kitchen Ranges and Ovens*,
   47 Fed. Reg. 57,198 (Dec. 22, 1982) ...................................................................... 8, 15

*Energy Conservation Program; Energy Conservation Standards for Residential Refrigerators, Refrigerator-Freezers, and Freezers*,
   75 Fed. Reg. 59,470 (Sept. 27, 2010) ......................................................................... 8

*Energy of Conservation Program for Consumer Products; Proposed Rulemaking and Public Hearings Regarding Energy Efficiency Standards for Refrigerators and Refrigerator-Freezers, Freezers, Clothes Dryers, Water Heaters, Room Air Conditioners, Kitchen Ranges and Ovens, Central Air Conditioners, and Furnaces*,
   47 Fed. Reg. 14,424 (Apr. 2, 1982) ....................................................................... 7, 13

**Constitutional Provisions**

U.S. Const. art. VI, cl. 2 ..................................................................................................... 3

# INTRODUCTION

The United States respectfully submits this Statement of Interest pursuant to 28 U.S.C. § 517 to address the proper interpretation and application of the Energy Policy and Conservation Act ("EPCA"), 42 U.S.C. §§ 6291-6317, to Plaintiffs' claims.[1] The United States Department of Energy ("Department" or "DOE") is responsible for administering the EPCA. For the reasons set forth in Defendant's Memorandum of Law in Support of its Motion to Dismiss, or, in the Alternative, Motion for Summary Judgment ("Defs." Mem."), ECF No. 18-1, the Court should not reach the merits of Plaintiffs' challenge because Plaintiffs lack Article III standing to challenge Montgomery County Bill 13-22 and because Plaintiffs' challenge is unripe. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) ("Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." (citation omitted)). However, if the Court were to reach the merits, the United States has a strong interest in ensuring that the EPCA's preemption provision is not erroneously interpreted to preempt State and local laws that do not regulate the energy efficiency or use of any commercial or industrial product covered by federal energy conservation standards.

# BACKGROUND

**1.** The EPCA establishes "energy efficiency standards for certain commercial and industrial equipment." *Am. Pub. Gas Ass'n v. U.S. Dep't of Energy*, 22 F.4th 1018, 1022 (D.C. Cir.

---

[1] Congress has authorized the Attorney General to send "any officer of the Department of Justice . . . to any . . . district in the United States to attend to the interests of the United States in a suit pending in a court of the United States." 28 U.S.C.§ 517. "A statement of interest, which is authorized by 28 U.S.C. § 517, is designed to explain to a court the interests of the United States in litigation between private parties." *Hunton & Williams v. U.S. Dep't of Justice*, 590 F.3d 272, 291 (4th Cir. 2010) (Michael, J., dissenting).

1

2022).² It sets specific energy conservation standards for certain covered products—typically appliances such as air conditioners, water heaters, furnaces, and dishwashers—and also authorizes the Secretary of Energy to issue new or revised standards. 42 U.S.C. § 6295. The statute defines "energy conservation standard" to include, in relevant part, "a performance standard which prescribes a minimum level of energy efficiency or a maximum quantity of energy use" or water use for a covered product. *Id.* § 6291(6). "[E]nergy efficiency" is "the ratio of the useful output of services consumed from a consumer product to the energy use of such product." *Id.* § 6291(5). "[E]nergy use" is defined as "the quantity of energy directly consumed by a consumer product at point of use." *Id.* § 6291(4). The specific measures of both energy use and energy efficiency must be "determined in accordance with test procedures" set by the Secretary. *Id.* § 6291(4), (5).

The EPCA contains an express preemption provision, which displaces certain state and local standards where a federal standard exists for a covered product. *Id.* § 6297. As indicated by its title, § 6297(c) sets out a "[g]eneral rule of preemption," which provides that for any product for which a federal energy conservation standard exists, "no State regulation concerning the energy efficiency, energy use, or water use of such covered product shall be effective with respect to such product unless the regulation" falls into one of several specific categories, not relevant here. The EPCA also authorizes the Secretary to waive the preemption of State or local regulations in certain circumstances. *Id.* § 6297(d).

**2.** In December 2022, the County Council of Montgomery County, Maryland adopted Bill 13-22, entitled "Buildings—Comprehensive Building Decarbonization," which became effective

---

² The EPCA addresses consumer products and industrial equipment in separate statutory provisions. *See* 42 U.S.C. §§ 6291-6309 (consumer); *id.* §§ 6311-17 (industrial). The provisions are substantially similar, and for purposes of this matter, any differences are immaterial. Accordingly, for ease of reference, this Statement cites the provisions applicable to consumer products.

2

on March 23, 2023.  Bill 13-22 requires the Montgomery County Executive to issue a building code by December 31, 2026 that establishes "all-electric building standards" for new construction.  *See* Montgomery Cnty. Code § 8-14D(b).  The Code defines "[a]ll-electric building" as a "public or private building that contains no combustion equipment, or plumbing for combustion equipment, installed within the building or building site."  *Id.* § 8-14D(a).  "Combustion equipment" is defined as "any equipment or appliance used for space heating, service water heating, cooking, clothes drying and/or lighting that uses fuel gas or fuel oil."  *Id.*

Bill 13-22 also expressly exempts certain buildings or equipment from the future all-electric building standards, *id.* § 8-14D(c), and authorizes the County Executive to "include additional exemptions" of all-electric standards for reasons of "practical difficulty or undue hardship," *id.* § 8-14D(b)(2).  In addition, the Bill also requires that the regulations include a "code modification process," which may only be granted "if the resulting building is carbon-neutral or net-zero."  *Id.* § 8-14D(b)(1).  The relevant terms "carbon neutral" and "net zero" are undefined by the Bill.[3]

Notably, although Bill 13-22 is now in effect, the County Executive has not yet issued a building code with all-electric building standards.  The deadline for doing so is December 2026.

## DISCUSSION

**1.**  The Supremacy Clause of the United States Constitution provides that federal law "shall be the supreme Law of the Land . . . , any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. Const. art. VI, cl. 2.  While Congress undoubtedly *can* preempt

---

[3] The term "code modification process" is also undefined by the Bill.  However, according to Defendant, its Department of Permitting Services has an existing process by which a party may seek a modification of building code standards applicable to building construction or building design plans.  *See* Defs.' Mem. at 7 & n.11.

3

state law, courts must "never assum[e] lightly that Congress has derogated state regulation." *New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 654 (1995). "Consideration under the Supremacy Clause starts with the basic assumption that Congress did not intend to displace state law." *Just Puppies, Inc. v. Brown*, 123 F.4th 652, 661 (4th Cir. 2024) (quoting *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981)). "Thus, preemption will not lie unless it is 'the clear and manifest purpose of Congress.'" *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).

Plaintiffs allege that Bill 13-22 is preempted by the EPCA's preemption provision, 42 U.S.C. § 6297(c), because Bill 13-22 "regulate[s] the energy use of gas appliances—by preventing such use entirely." Compl. ¶ 1, ECF No. 1. For the reasons the United States has previously detailed, the EPCA's preemption clause only covers State and local regulations that impose energy conservation standards or similar performance standards that govern the energy efficiency or energy consumption of covered products, *i.e.*, the quantity of energy directly consumed ("energy use") or the ratio of useful output to energy consumed ("energy efficiency"). *See* Amicus Br. for the United States in Supp. of Appellee, *Cal. Rest. Ass'n v. City of Berkeley*, No. 21-16278, ECF No. 33 (attached as Ex. 1); Br. for the United States as Amicus Curiae in Supp. of Pet. for Reh'g, *Cal. Rest. Ass'n*, ECF. No. 94 (attached as Ex. 2). Accordingly, the EPCA does not preempt State and local regulations, like Bill 13-22, that do not prescribe a product's energy efficiency, energy use, or water use, as those terms are defined in the EPCA, but only indirectly affect the circumstances in which a covered product may be used. *See* Ex. 1 at 7-14; Ex. 2 at 6-10.

Section 6297(c) provides that once a federal conservation standard becomes effective for a covered product, "no State regulation concerning the energy efficiency, energy use, or water use of such covered product shall be effective with respect to such product," absent a specific

4

exemption. 42 U.S.C. § 6297(c). By its plain terms, the preemption provision is triggered when a federal "energy conservation standard" comes into effect for a covered product. *Id.* An "energy conservation standard" means "a performance standard which prescribes a minimum level of energy efficiency or a maximum quantity of energy use, or . . . water use" for a covered product. *Id.* § 6291(6). Once the Federal Government sets a standard for a covered product prescribing its energy efficiency, energy use, or water use, the EPCA then provides that "no State regulation concerning the *energy efficiency, energy use,* or *water use* of such *covered product* shall be effective with respect to such product." *Id.* § 6297(c) (emphases added).

Thus, the EPCA's preemption provision mirrors the scope of authority that the EPCA confers on the Department to issue energy conservation standards for covered products. *See* Ex. 2 at 6-7. That is apparent from the EPCA's use of the same terms—"energy efficiency," "energy use," and "water use" for a "covered product"—to define both the federal energy conservation standards that the Department issues and the scope of State and local laws that are preempted by such energy conservation standards. To put it simply, the EPCA prevents States and localities from attempting to do at their level what the Department does at the federal level. *See Bldg. Indus. Ass'n of Wash. v. Wash. State Bldg. Code Council*, 683 F.3d 1144, 1148 (9th Cir. 2012) ("[T]he federal statute preempts state attempts to impose minimum standards [for energy efficiency] greater than the federal law."); *Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n*, 410 F.3d 492, 500 (9th Cir. 2005) (EPCA "preempt[s] state energy efficiency standards").

That conclusion is reinforced by other textual cues in the statute. The title of the preemption provision states that it sets out a "[g]eneral rule of preemption for *energy conservation standards*," 42 U.S.C. § 6297(c) (emphasis added), equating the scope of federal authority

(prescribing standards setting minimum levels of energy efficiency or maximum levels of energy or water use, *id.* § 6291(6)) with the scope of preemption provisions (state laws that prescribe such standards). Similarly, the preemption clause provides that a preempted State or local regulation "concerning energy efficiency, energy use, or water use of *such covered product*" shall not be "effective with respect to *such product*." *Id.* § 6297(c) (emphases added). That product-focused language indicates that preempted regulations are ones that are drawn with respect to "such" covered product, *i.e.*, a State or local regulation governing the efficiency of or amount of energy or water used by a particular product. By contrast, a State or local general building or safety standard that does not directly regulate any covered product would be excluded. *See* Ex. 2 at 9-10.

In addition, the EPCA's waiver provision allows the Department to waive preemption of a state energy use or efficiency standard if a State or locality can show "unusual and compelling . . . local energy or water interests," such as when "energy or water savings resulting from the State regulation" outweigh its overall costs. 42 U.S.C. § 6297(d)(1)(B), (C). But many State and local regulations that might have an indirect effect on the "energy use" of covered products in some way, including regulations aimed at health and safety goals like the avoidance of pollution or reduction of emissions, may not generate any energy or water savings at all. After all, unlike energy conservation standards, they are not targeted at altering the quantity of water or energy consumed or the efficient use of energy. It is highly unlikely that Congress intended to broadly preempt State and local regulations that either (i) set energy efficiency or energy or water use requirements *or* (ii) are targeted at other goals than energy efficiency or energy or water use, but have an indirect effect on the use of covered products, while constraining the Department's waiver authority to only the former. That is particularly the case given that the preemption clause was

6

animated by Congress's concern about the former—namely that States and localities were imposing a patchwork of differing energy conservation standards that would require manufacturing different models for different localities. *See Air Conditioning & Refrigeration Inst.*, 410 F.3d at 500 (§ 6297(c) was designed to "counteract the systems of separate state appliance standards that had emerged" and which "complicate[d]" appliance manufacturers' "design, production, and marketing plans" (citation omitted)). Rather, the better interpretation is that Congress intended the preemption waiver to address the full class of regulations that are preempted by the EPCA—regulations that directly regulate the energy efficiency or energy or water use of a covered product. *See* Ex. 1 at 11-12.

Moreover, the Department has long interpreted the EPCA's preemption provision to cover State and local regulations that prescribe standards regarding the energy efficiency or energy or water use of covered products, but not those that only indirectly affect the use of covered products. In a 1982 proposed rule on preemption waivers, the Department described the agency's interpretation of the scope of the preemption provision—which then covered "any energy [efficiency] standard or other requirement with respect to energy efficiency or energy use of a covered product," 42 U.S.C. § 6297(a)(2) (1982)—stating that "[a] rule whose purpose is other than energy efficiency such as a law on fire safety, would not appear to be preempted by the Federal rule, even if it has a secondary and incidental effect of improving the efficiency of a covered product." *Energy of Conservation Program for Consumer Products; Proposed Rulemaking and Public Hearings Regarding Energy Efficiency Standards for Refrigerators and Refrigerator-Freezers, Freezers, Clothes Dryers, Water Heaters, Room Air Conditioners, Kitchen Ranges and Ovens, Central Air Conditioners, and Furnaces*, 47 Fed. Reg. 14,424, 14,456 (Apr. 2, 1982). In the resulting final rule, the Department illustrated the operation of the preemption clause through

7

examples. *Energy Conservation Program for Consumer Products; Final Rule for Clothes Dryers and Kitchen Ranges and Ovens*, 47 Fed. Reg. 57,198, 57,215 (Dec. 22, 1982).  A "[p]rohibition of hook-ups for appliances with *less than a certain efficiency* would be subject to preemption," but, by contrast, a "[p]rohibition against placing oversized furnaces and air conditioners in new buildings would not be subject to preemption." *Id.* at 57,215.  In other words, a ban on the connection of certain appliances would be preempted if its application was contingent on the efficiency of the appliance, while a ban that does not directly regulate the efficiency or energy or water use of the appliance would not be.  *See also Energy Conservation Program; Energy Conservation Standards for Residential Refrigerators, Refrigerator-Freezers, and Freezers*, 75 Fed. Reg. 59,470, 59,530 (Sept. 27, 2010) (explaining that the Department "interprets 'regulation concerning energy use'" in § 6297(c) "to be equivalent to 'energy conservation standard'").

  **2.** Under the proper interpretation of § 6297(c), Bill 13-22 is not preempted by the EPCA.  The Bill does not prescribe "a minimum level of energy efficiency or a maximum quantity of energy use" for any covered product.  42 U.S.C. § 6291(6).  It does not even regulate any covered product at all—it merely requires promulgation of a future building code providing for all-electric standards for the construction of new buildings.  And even that future building code, at most, is likely to require a change in the *type* of energy used, not its efficiency or quantity. Nor does Bill 13-22 implicate the purposes of EPCA preemption.  Its enactment does not require any appliance manufacturer to redesign any covered product or adjust or alter its energy efficiency or usage to meet standards higher than the federal conservation standard.

  The conclusion that § 6297(c) does not preempt Bill 13-22 draws further support from the Bill's code modification provision.  That provision indicates that any building code promulgated under Bill 13-22 (which, to be clear, is still yet to be proposed) must include a process for

8

modifying the building code applicable to "carbon-neutral or net-zero" buildings. *See* Montgomery Cnty. Code § 8-14D(b)(1).[4] The inclusion of a code modification process means that, contrary to Plaintiffs' assertions, neither Bill 13-22 nor the future resulting building code even constitutes a "ban on the use of gas appliances." Compl. ¶ 1. Rather, the resulting building code (likely) will allow the use of measures other than the use of all-electric appliances (such as renewable energy credits) to comply with the building code.

Moreover, in the Inflation Reduction Act of 2022 ("IRA") Congress authorized the Secretary of Energy to issue grants to States and localities to adopt such building codes, *i.e.*, "building energy code[s] . . . that meet[] or exceed[] the zero energy provisions in the 2021 International Energy Conservation Code ["IECC"] or an equivalent stretch code." Pub. L. No. 117-169 § 50131(c)(1), 136 Stat. 1818, 2042 (2022). Indeed, Montgomery County has been awarded such a grant in connection with Bill 13-22.[5]

The zero energy provisions in the IECC, referenced in § 50131 of the IRA, provide that energy generation from renewable sources (either at the building site or off-site and applied to the building) must be greater than or equal to the building's energy use, calculated without consideration of any reduction in energy usage due to such renewable energy sources.[6] Approaches to comply with the IECC requirements include all-electric buildings or the use of

---

[4] A "net-zero" or "zero energy" building is an energy-efficient building where the annual delivered energy is less than or equal to the renewable energy generated from the site. *See* Dep't of Energy, *A Common Definition for Zero Energy Buildings* at 2, 4, https://www.energy.gov/sites/default/files/2015/09/f26/bto_common_definition_zero_energy_buildings_093015.pdf (last visited Jan. 14, 2025).

[5] *See* Dep't of Energy, *Selection Summary – Inflation Reduction Act Support for Building Energy Codes and Innovative Codes – Round 1*, https://www.energy.gov/scep/selection-summary-inflation-reduction-act-support-building-energy-codes-and-innovative-codes (last visited Jan. 15, 2025).

[6] *See* 2021 International Energy Conservation Code, Appendix CC, available at: https://codes.iccsafe.org/content/IECC2021P2/appendix-cc-zero-energy-commercial-building-provisions (last visited Jan. 16, 2025).

9

appliances with efficiencies greater than the Federal minimum standards in order to reduce the amount of offsetting renewable energy required.[7] Congress broadly authorized the Department to issue grants to States and localities to develop such standards, without limiting that authority only to those standards without restrictions on use of natural gas-fueled appliances or requirements for heightened efficiency requirements.  Not only that, Congress authorized grants for standards that "*exceed[]*" the IEEC zero energy provisions, which in the context of a net-zero requirement is best read to refer to standards that achieve zero energy use more effectively or through stricter means than even in the IECC zero energy provisions.  While Montgomery County's net-zero code modification process is—like the rest of the building code to be promulgated pursuant to Bill 13-22—as yet undefined, the Department's authorization to issue grants to localities to develop such building codes indicates that Congress did not believe such codes to be preempted by the EPCA. *See United States v. Perkins*, 67 F.4th 583, 611 (4th Cir. 2023) ("As a matter of statutory construction, federal courts 'presume that Congress is knowledgeable about existing law pertinent to the legislation in enacts.'" (quoting *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 184-85 (1988)).

Finally, a contrary holding that the EPCA preempts laws like Bill 13-22 that have, at most, a downstream impact on covered products would stretch the EPCA far beyond its intended scope. Many local health and safety regulations have an indirect impact on consumers' ability to use a product in certain circumstances.  For example, local noise ordinances and outdoor lighting

---

[7] *See, e.g.*, 2021 IECC CC103.1 (requiring that for compliance pathways under C401.2.1 Item 2, applicable to commercial buildings, the total building energy be calculated from simulations and, through C401.2.1, cross-referencing C407, which requires accounting for the estimated consumption from the particular equipment installed).  These provisions incentivize buildings to adopt high efficiency appliances above the minimum federal standards, which in key applications will be all-electric, in order reduce the cost of offsetting renewable generation.  In other words, they affect the use of certain covered products that nonetheless comply with federal energy conservation standards, such as natural gas-fueled appliances, by disincentivizing their use.

restrictions could have the effect of restricting or prohibiting the use of certain covered products. But nothing in the EPCA suggests that Congress intended ECPA's reach to broadly displace State or local laws that prohibit the use of items that the State or locality determined are dangerous, unsafe, unhealthy, or a nuisance—an area of traditional State and local authority. *See* Ex. 1 at 21-24; Ex. 2 at 17-19. Notably, the EPCA does not authorize the Department to itself set local building codes or to address State or local health and safety matters or nuisance abatement. *Cf. Travelers*, 514 U.S. at 656 (looking to "objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive"). The Court should decline Plaintiffs' invitation to confer on the Department wide-ranging authority to override such State and local laws whenever the Department sets an energy conservation standard. *See Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 468 (2001) (Congress does not "hide elephants in mouseholes").

  **3.** Relying on the Ninth Circuit's erroneous decision in *California Restaurant Ass'n v. City of Berkeley*, 89 F.4th 1094, 1101 (9th Cir. 2024) (holding that § 6297(c) preempted a City of Berkeley ordinance prohibiting the installation of natural gas infrastructure in newly constructed buildings), Plaintiffs contend that Bill 13-22 is preempted because it prohibits the installation of natural gas appliances. Compl. ¶ 4. For starters, that misinterprets Bill 13-22—which, does not itself impose any substantive requirement on new constructions, but merely requires future promulgation of a building code. *See supra* p. 8. In any event, the Ninth Circuit's decision in *California Restaurant Association* is inherently flawed—as recognized by the eleven judges who dissented from the denial of rehearing en banc—and this Court should decline to follow its reasoning. *See, Cal. Rest. Ass'n*, 89 F.4th at 1126 (Friedland, J., dissenting from denial of rehearing) ("The panel opinion unnecessarily strikes down the ordinance by entirely misinterpreting a narrow preemption provision about appliance standards.").

The Ninth Circuit's erroneous construction of § 6297(c) rests on four interpretive flaws. *First*, the court construed the preemption of regulations concerning "energy use" to protect "the end-user's ability to *use* installed covered products at their intended final destinations." *Id.* at 1101-02. The court grounded this conclusion in the EPCA's inclusion of the term "point of use" in the statutory definition of "energy use." That reading overlooks the full statutory text and the technical nature of the EPCA.

As noted above, the EPCA defines "[e]nergy use" as the quantity of energy consumed "at point of use, determined in accordance with test procedures" measuring an appliance's typical energy use over "a representative average use cycle or period of use." 42 U.S.C. §§ 6291(4), 6293(b)(3). Thus, the statute defines energy use under *standardized testing conditions*—not in relation to how a consumer actually uses the product in a particular location. In other words, the term "aims to approximate the *typical* energy use of an appliance during operation," but "does not depend on any given consumer's *actual* use." *Cal. Rest. Ass'n*, 89 F.4th at 1122 (Friedland, J., dissenting from rehearing en banc).[8]

Moreover, the court's reliance on the dictionary definition of "point of use" in ordinary parlance, *id.* at 1101, ignores that "point of use" has a "well-established technical meaning that must be applied here," *id.* at 1123 (Friedland, J., dissenting from rehearing en banc); *see also Van Buren v. United States*, 593 U.S. 374, 388 n.7 (2021) ("[W]hen a statute, like this one, is addressing a technical subject, a specialized meaning is to be expected." (cleaned up)). "Point of use" refers

---

[8] For example, DOE's energy conservation standard for certain cooking products, including natural gas-fueled cook tops, is expressed as "a measure of the estimated energy usage for a given cooktop model" for one year "as determined according to the DOE test procedure." *See* Energy Conservation Program: Energy Conservation Standards for Consumer Conventional Cooking Products, 89 Fed. Reg. 11434, 11436 (Feb. 14, 2024). A large family that cooks meals frequently at home may consume more natural gas in operating their cooktop than in the one-year estimate on which the Department's standard is based. But that has no bearing on the applicability of the Department's conservation standard, which does not turn on how much energy is in fact used by consumers.

to the amount of "site energy" used, *i.e.*, the energy that is directly consumed by a product from the pipe or outlet. *See Cal. Rest. Ass'n*, 89 F.4th at 1123 (Friedland, J., dissenting from rehearing en banc). Site energy is distinct from "source energy," which refers to the amount of energy used at the point of use plus the energy consumed in producing and delivering the site energy, including any energy lost before the site energy is delivered. *See id.*; *see also* 47 Fed. Reg. at 14,427 ("'Energy use' is defined in the Act as the quantity of energy directly consumed by a consumer product at point of use. This is sometimes referred to as 'site' energy, as opposed to source energy."); *see also* Dep't of Energy, *The Difference Between Source and Site Energy*, https://www.energystar.gov/buildings/benchmark/understand-metrics/source-site-difference (last visited Jan. 14, 2025). Congress's use of the technical term "point of use," particularly when coupled with the reference to "test procedures," thus defines how energy use should be measured and does not create a right for consumers to use a particular covered product.

*Second*, the Ninth Circuit held that Congress "expand[ed] preemption beyond direct or facial regulations of covered appliances" by preempting State and local regulations "concerning" the energy efficiency, energy use, and water use of covered products. *Cal. Rest. Ass'n*, 89 F.4th at 1103. While the Ninth Circuit interpreted the term "concerning" "expansively," *id.*, the Supreme Court has cautioned against broadly defining "elastic" terms "refer[ring] to a relationship or nexus of some kind" without reference to the broader statutory context. *Dubin v. United States*, 599 U.S. 110, 119, 121 (2023) (interpreting term "in relation to" narrowly, in light of the title of the statute); *Travelers*, 514 U.S. at 655 ("If 'relate to' were taken to extend to the furthest stretch of its indeterminacy, then for all practical purposes pre-emption would never run its course, for really, universally, relations stop nowhere." (citation omitted) (cleaned up)).

As discussed above, the broader context—the use of the same elements to define energy conservation standards and the State or local regulations that are preempted by § 6297(c); the title of § 6297(c); the product-focused language used in § 6297(c); and the conflict between a broad interpretation of § 6297(c) and the EPCA's waiver provisions—all indicate that Congress intended that "concerning" have the narrower meaning of "about" or "on the subject of." *See, e.g.*, Collins English Dictionary, https://www.collinsdictionary.com/us/dictionary/english/concerning (defining "concerning" as "in regard to" or "about"). Indeed, in another provision of § 6297, Congress used the term "concerning" in exactly that fashion. In § 6297(d)(6), Congress explained what happens when the Secretary has granted a waiver from preemption for a particular regulation and subsequently the federal "energy conservation standard *concerning* such product is amended." 42 U.S.C. § 6297(d)(6) (emphasis added). That provision would make little sense unless "concerning" had a narrow meaning. And "similar language contained within the same section of a statute must be accorded a consistent meaning." *Nat'l Credit Union Admin. v. First Nat'l Bank & Tr. Co.*, 522 U.S. 479, 501 (1998).

*Third*, the Ninth Circuit pointed to the fact that the EPCA's waiver provision applies to regulations that "provide[] for any conservation standard or other requirement with respect to energy use, energy efficiency, or water use for any . . . covered product." 42 U.S.C. § 6297(d)(1)(A). The court concluded that a regulation governing "energy use" could not refer to "an energy conservation standard" without "creat[ing] redundancy in the statutory text." *Cal. Rest. Ass'n*, 89 F.4th at 1105. But "general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." *Wash. State Dep't of Soc. & Health Servs. v. Guardianship Estate of Keffeler*, 537 U.S. 371, 384 (2003) (citation omitted). Thus, the use of both terms "energy conservation standard" and "other requirement" simply ensures that the

14

provision covers all types of regulations governing energy efficiency or energy or water use, regardless of how styled.

*Fourth*, the Ninth Circuit held that, because § 6297(f) creates an exemption from preemption for certain types of building codes, § 6297(c) must extend beyond direct or facial regulations of covered products. *Cal. Rest. Ass'n*, 89 F.4th at 1101. But that reasoning skips a step. To be sure, building codes *can* fall within the scope of the preemption clause if they establish energy conservation standards or similar requirements for covered products. *See* 42 U.S.C. § 6297(f)(3) (providing for an exemption from preemption for "a regulation or other requirement contained in a State or local building code for new construction *concerning the energy efficiency or energy use of such covered product*" (emphasis added)); 47 Fed. Reg. at 57,215 ("[p]rohibition of hook-ups for appliances with *less than a certain efficiency* would be subject to preemption" (emphasis added)). That does not indicate that the EPC would preempt a building code that does not govern the energy efficiency or energy or water use of a covered product.

## **CONCLUSION**

For the foregoing reasons, the EPCA does not preempt Montgomery County Bill 13-22.

| | |
|---|---|
| Dated: January 17, 2025 | Respectfully submitted,<br><br>BRIAN M. BOYNTON<br>Principal Deputy Assistant Attorney General<br><br>JOSEPH E. BORSON<br>Assistant Branch Director<br>Federal Programs Branch<br><br>*/s/ Christine L. Coogle*<br>CHRISTINE L. COOGLE<br>Trial Attorney<br>CHETAN A. PATIL<br>Senior Trial Counsel<br>U.S. Department of Justice<br>Civil Division, Federal Programs Branch<br>1100 L St., NW<br>Washington, DC 20005<br>Tel: (202) 880-0282<br>Email: christine.l.coogle@usdoj.gov<br><br>*Counsel for the United States of America* |