# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| NATIONAL ASSOCIATION OF HOME BUILDERS OF THE UNITED STATES<br>1201 15th St NW, Suite 400<br>Washington, DC 20005 | CASE NO. 8:24-CV-03024-PX |
| RESTAURANT LAW CENTER<br>2055 L St NW, Suite 700<br>Washington, DC 20036 | **FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| NATIONAL FEDERATION OF INDEPENDENT BUSINESS, INC.<br>555 12th Street NW, Suite 1001<br>Washington, DC 20004 | |
| MARYLAND BUILDING INDUSTRY ASSOCIATION<br>11825 West Market Place<br>Fulton, Howard County, MD 20759 | |
| NATIONAL PROPANE GAS ASSOCIATION<br>1140 Connecticut Ave., NW, Suite 1075<br>Washington, DC 20036 | |
| WASHINGTON GAS LIGHT COMPANY<br>1000 Maine Ave., SW<br>Washington, DC 20024 | |
| PHILADELPHIA-BALTIMORE-WASHINGTON LABORERS' DISTRICT COUNCIL<br>665 N. Broad Street<br>Philadelphia, PA 19123 | |
| TEAMSTERS LOCAL 96<br>5627 Allentown Rd, Suite 202<br>Camp Springs, Prince Georges County, MD 20746 | |
| *Plaintiffs,* | |
| v. | |
| MONTGOMERY COUNTY, MARYLAND<br>101 Monroe Street, 2nd Floor<br>Rockville, MD 20850 | |
| *Defendant.* | |

**INTRODUCTION**[1]

1. Plaintiffs National Association of Home Builders of the United States, Restaurant Law Center, National Federation of Independent Business, Inc., Maryland Building Industry Association, National Propane Gas Association, Washington Gas Light Company, Philadelphia-Baltimore-Washington Laborers' District Council, and Teamsters Local 96 seek declaratory and injunctive relief under federal law against enforcement of provisions of Montgomery County Bill 13-22: Buildings–Comprehensive Building Decarbonization ("County Appliance Ban"), which sets into motion the process for banning the use of gas appliances in new construction. The Energy Policy and Conservation Act ("EPCA"), 42 U.S.C. §§ 6201-6422, already regulates the energy use of such appliances and expressly preempts state and local laws on that subject. The County Appliance Ban falls within the heartland of EPCA's express preemption provision because it too purports to regulate the energy use of gas appliances—by preventing such use entirely. As such, the County Appliance Ban is preempted by EPCA and unenforceable as a matter of law.

2. Born out of the oil crisis of the 1970s and the accompanying concerns with energy independence, EPCA implements a national energy policy that, among other things, regulates the energy use and energy efficiency of appliances. *See, e.g.*, 42 U.S.C. § 6297(c). The thrust of EPCA is that nationally uniform energy use and efficiency standards are the best way to promote conservation goals while ensuring energy security and domestic supply and preserving consumer choice. *See, e.g.*, *id.*; S. Rep. No. 100-6, at 4 (1987); H.R. Rep. No. 100-11, at 24 (1987).

---

[1] Pursuant to Local Rule 103.6(c), attached as Exhibit 1 is a copy of this First Amended Complaint that reflects the changes from the Original Complaint.

3. To accomplish that needed national uniformity, EPCA expressly preempts state and local regulations concerning the energy use and energy efficiency of products for which EPCA sets energy conservation standards—with only the narrowest of exceptions to that preemption for state and local regulations that meet certain stringent statutory conditions. 42 U.S.C. §§ 6297(c)(3), (f)(3).

4. The Ninth Circuit's invalidation of the City of Berkeley's prohibition on gas piping in new buildings just last year is particularly noteworthy since it struck down this same kind of attack on gas appliances. *Cal. Rest. Ass'n v. City of Berkeley*, 65 F.4th 1045 (9th Cir. 2023), *amended and superseded by Cal. Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094 (9th Cir. 2024). Perhaps most notable is that the unanimous Ninth Circuit panel emphasized that "EPCA would no doubt preempt an ordinance that directly prohibits the use of covered natural gas appliances in new buildings." *Cal. Rest. Ass'n*, 89 F.4th at 1107. Because the County Appliance Ban does exactly that, there is "no doubt" that EPCA preempts it. *See id.* Indeed, some state and local governments have since taken note of EPCA and reconsidered their efforts to enact similar bans. *See, e.g.,* Kale Williams, *Eugene reverses natural gas ban after ruling by federal appeals court*, KGW8 (July 12, 2023), https://www.kgw.com/article/news/politics/natural-gas-ban-eugene-oregon-repealed/283-5195461a-22cd-4176-9db7-8047fb56d887. Because the County did not do so on its own, the Court must order it to do the same.

5. The County Appliance Ban inflicts serious and irreparable harm. Banning the use of gas appliances in new construction is at odds with the needs of County residents, workers, and businesses for affordable, resilient, and reliable energy. Prohibiting gas-powered cooking ranges, water heaters, furnaces, and other appliances or equipment is fundamentally inconsistent with the

public interest and consumer choice, exacerbates the County's housing crisis, and aims to shift the County's energy demand to an electric system that is facing both historic and increasing electricity demand and dwindling dispatchable electricity supply. Due to the County Appliance Ban artificially limiting the pool of gas customers, homes, restaurants, and other businesses that rely upon gas services will be forced to pay higher gas prices than they would otherwise have to pay. Thus, the County Appliance Ban will negatively impact existing buildings as well.

6. The County Appliance Ban operates by mandating the promulgation of regulations for approval by the County Council to accomplish the ban, but its deleterious effects are already manifesting. The County Appliance Ban is causing customers to choose electricity over gas, thereby reducing the demand for gas and harming Plaintiffs. Further, by calling into question the long-term prospects for gas-related trades, the County Appliance Ban likely is reducing the number of workers who wish to enter those trades. That harms the unions representing those workers— including the applicable Plaintiffs here—by shrinking their pool of future members and harming their bargaining power. To be sure, these harms and others will be amplified once the County Appliance Ban takes its future form as an approved regulation, but they are being felt now as well.

7. Plaintiffs—a group of trade associations, companies, and unions that rely on the availability of gas appliances and systems for their livelihoods—stand to lose much if the County Appliance Ban is not enjoined. Plaintiffs and their members span a broad array of industries and labor, including construction, food service, retail, and delivery related to gas and gas infrastructure. The County Appliance Ban is already undermining their livelihoods, harming profits, disrupting long-term business strategy and asset planning, jeopardizing jobs and hiring and training programs, and hampering the ongoing development of new desperately needed multifamily homes. And those

harms will only increase as time goes on and the County Appliance Ban becomes an approved regulation. Ultimately, the County Appliance Ban will diminish Plaintiffs' businesses and trades and substantially increase the cost for homes, lodging, and energy in the County—all despite federal law's express preemption of it.

8. In sum, the County Appliance Ban is plainly preempted by EPCA, is already inflicting substantial irreparable harm on Plaintiffs and their members, and will cause even more harm unless enjoined. Plaintiffs accordingly bring this action seeking a declaration that the County Appliance Ban is preempted by EPCA and an injunction preventing its enforcement.

## JURISDICTION AND VENUE

9. Jurisdiction is proper because, under 42 U.S.C. § 6306(c), federal district courts have express jurisdiction over suits brought by any adversely affected person concerning state compliance with EPCA. Additionally, under 28 U.S.C. § 1331, the Court has federal question jurisdiction to determine the claims involving EPCA.

10. This Court has personal jurisdiction over Montgomery County and authority to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202 and Rules 57 and 65 of the Federal Rules of Civil Procedure.

11. Venue in this Court is proper under 28 U.S.C. § 1391(b) because, among other things, (i) the actions violating federal law stated in this Complaint impose injury in the state of Maryland, where Plaintiffs or their members either reside and/or do business, and (ii) the law at issue will be enforced here.

**PARTIES**

12. Plaintiff National Association of Home Builders of the United States ("NAHB") is a nonprofit corporation organized under the laws of Nevada with its principal office in Washington, D.C. It represents the U.S. residential building construction industry and has approximately 140,000 members across all fifty states. NAHB's mission is to protect and provide housing opportunities for the American public while promoting the business interests of its members. Among NAHB's members are land developers, builders, vendors, trades, building owners, and product manufacturers. The NAHB has one or more members that do business in Montgomery County and are suffering or will imminently suffer harm to their profits and business operations as a result of the impending appliance ban. For example, one of NAHB's members has built over 4,000 homes since its founding in 1978, and "natural gas has been the preferred source for heating, hot water, cooking, and gas fireplaces for at least 90%" of its homeowners. Ex. 2, Am. Thomas E. Kettler Decl., ¶ 5. "The County Appliance Ban will put [the company] at an economic disadvantage, as potential customers may opt to purchase homes in other counties or in Virginia due to the ban." *Id.* Similarly, another one of NAHB's members "will be required to incur additional costs to comply with all-electric standards, which is likely to result in a decrease in new home construction. Furthermore, [the company's] clients, many of whom operate within strict budgetary constraints, may find themselves unable to afford new homes, as the all-electric requirements would exceed their financial means." Ex. 3, Am. Douglas Tyler Wood Decl.,¶ 5. Furthermore, both companies are long-time gas customers in Montgomery County, and having access to affordable gas services is important to them. Ex. 2, Am. Thomas E. Kettler Decl., ¶ 6; Ex. 3, Am. Douglas Tyler Wood Decl., ¶ 6. The County Appliance Ban is already eroding the pool

of gas customers by causing some would-be gas customers to choose electricity instead and will limit it further once it becomes an approved regulation. That reduced customer base means that existing gas customers like these companies will have to pay higher rates for gas service than they would otherwise pay. *Id.* Additionally, one of NAHB's members is an appliance manufacturer that sells gas appliances, "including energy-efficient tankless water heaters, home heating appliances, kitchen appliances, and gas clothes dryers[,]" in Montgomery County. Ex. 4, Am. Perry McGuire Decl., ¶ 2. The County Appliance Ban will harm this member, as the company "will face significant sales losses if new buildings and homes in Montgomery County can no longer use the gas appliances we manufacture and sell due to the County Appliance Ban." *Id.* at ¶ 5. The County Appliance Ban is inflicting real harm now by negatively affecting NAHB's members' financial operations and influencing their business decisions. Ex. 2, Am. Thomas E. Kettler Decl., ¶¶ 7-8; Ex. 3, Am. Douglas Tyler Wood Decl., ¶¶ 8-9; Ex. 4, Am. Perry McGuire Decl., ¶ 7.

13. Plaintiff Restaurant Law Center ("RLC") was officially established in 2016 as an independent public policy organization supporting the restaurant and food-service industry across the United States. While the RLC is its own independent organization with its own Board of Directors, all members in good standing with the National Restaurant Association and State Restaurant Associations are members of the RLC. As such, RLC represents an industry that includes over one million restaurant and food-service outlets employing approximately 14.7 million employees, or approximately 10% of the workforce in the United States. RLC's members include more than 500,000 restaurant businesses located across the United States, including businesses in Montgomery County. RLC's members will be harmed by the County Appliance Ban by making the rates they pay for gas service higher than they would otherwise be due to limiting

the County's gas customer base—both by causing some would-be gas customers to choose electricity instead and then later, once it becomes an approved regulation, by outright prohibiting gas as an option for some customers. Ex. 5, Am. Angelo Amador Decl., ¶ 7. Many RLC members run on thin margins, making any increase in business operations significant. *Id.* Many RLC members in Montgomery County are already struggling due to a variety of unfavorable economic conditions. *Id.* at ¶ 8. Montgomery County restaurant owners still have not fully recovered from the pandemic,[2] and many have already gone out of business. *Id.* The County Appliance Ban will further exacerbate these unfavorable economic conditions. *Id.* The County Appliance Ban is inflicting real harm now by negatively affecting RLC's members' financial operations and influencing their business decisions. *Id.* ¶ 9.

14. Plaintiff National Federation of Independent Business, Inc. ("NFIB") is the nation's leading small business advocacy association, representing members in all 50 states and Washington, D.C. NFIB's members will be harmed by the County Appliance Ban by making the rates they pay for gas service higher than they would otherwise be due to limiting the County's gas customer base—both by causing some would-be gas customers to choose electricity instead and then later, once it becomes as an approved regulation, by outright prohibiting gas as an option for some customers. For example, one of NFIB's members that faces such harm is a home management and maintenance company that uses natural gas to heat several warehouse spaces in Montgomery County in the winter. Ex. 6, Jim Vagonis Decl., ¶ 5. For this member, "[n]atural gas

---

[2] National Restaurant Association, *Restaurant employment resumed its upward trajectory*, (Apr. 5, 2024), https://restaurant.org/research-and-media/research/economists-notebook/analysis-commentary/restaurant-employment-resumed-its-upward-trajectory/ (showing that February 2024 restaurant employment compared to February 2020 was -4% or lower in Maryland).

is the best and most affordable approach to do this." *Id.* An increase in gas rates would therefore financially harm this member.

15. Plaintiff Maryland Building Industry Association ("MBIA") formed in 2014 as the result of a merger between two local associations with over 175 years of combined experience: the Home Builders Association of Maryland that covered the Baltimore area and the Maryland National-Capital Building Industry Association that covered the District of Columbia and Southern Maryland. MBIA is a local chapter of the NAHB. MBIA is a not-for-profit trade organization representing the interests of over 1,100 member firms and more than 100,000 employees, including home builders, remodelers, developers, and affiliate professional and service providers in the Maryland Counties of Anne Arundel, Baltimore, Calvert, Carroll, Cecil, Charles, Harford, Howard, Montgomery, Prince George's and St. Mary's, as well as Baltimore City, the Eastern Shore, and the District of Columbia. MBIA has one or more members that do business in Montgomery County and are suffering or will imminently suffer harm to their profits and business operations as a result of the impending appliance ban. For example, one of MBIA's members has built over 4,000 homes since its founding in 1978, and "natural gas has been the preferred source for heating, hot water, cooking, and gas fireplaces for at least 90%" of its homeowners. Ex. 2, Am. Thomas E. Kettler Decl., ¶ 5. "The County Appliance Ban will put [the company] at an economic disadvantage, as potential customers may opt to purchase homes in other counties or in Virginia due to the ban." *Id.* Similarly, another one of MBIA's members "will be required to incur additional costs to comply with all-electric standards, which is likely to result in a decrease in new home construction. Furthermore, [the company's] clients, many of whom operate within strict budgetary constraints, may find themselves unable to afford new homes, as the all-electric

requirements would exceed their financial means." Ex. 3, Am. Douglas Tyler Wood Decl., ¶ 5. Additionally, both companies are long-time gas customers in Montgomery County, and having access to affordable gas services is important to them. Ex. 2, Am. Thomas E. Kettler Decl., ¶ 6; Ex. 3, Am. Douglas Tyler Wood Decl., ¶ 6. The County Appliance Ban will limit the pool of gas customers—both by causing some would-be gas customers to choose electricity instead and then later, once it becomes an approved regulation, by outright prohibiting gas as an option for some customers—thereby forcing existing gas customers like these companies to pay higher rates for gas service than they would otherwise pay. *Id.* The County Appliance Ban is inflicting real harm now by negatively affecting MBIA's members' financial operations and influencing their business decisions. Ex. 2, Am. Thomas E. Kettler Decl., ¶¶ 7-8; Ex. 3, Am. Douglas Tyler Wood Decl., ¶¶ 8-9.

16. Plaintiff National Propane Gas Association ("NPGA") is a nonprofit corporation organized under the laws of New Jersey with its principal office in Washington, D.C. It represents the U.S. propane industry and has approximately 2,400 members across all fifty states, including members in Maryland. Its members include retail marketers of propane gas who deliver the fuel to the end user, propane producers, transporters and wholesalers, and manufacturers and distributors of equipment, containers, and appliances. NPGA members who do business in Maryland are suffering or will imminently suffer harm to their revenues and business operations as a result of the County Appliance Ban. In particular, the County Appliance Ban is causing some would-be gas customers to choose other energy sources instead and then later, once it becomes an approved regulation, will prohibit the gas option entirely in some cases. That will reduce the demand for the propane gas that NPGA's members sell, thereby impacting their revenue and profits. Ex. 7, Todd Holtzman

10

Decl., ¶¶ 5-6. The County Appliance Ban is inflicting real harm now by negatively affecting NPGA's members' financial operations and influencing their business decisions. *Id.* ¶ 7.

17. Plaintiff Washington Gas Light Company ("WGL") is a regulated public utility that provides natural gas service to more than 1.2 million customers in the District of Columbia, Maryland, and Virginia. This includes over 241,000 customers in Montgomery County, Maryland, which make up nearly 47% of WGL's Maryland customer base. WGL has been providing energy to residential, commercial, and industrial customers for 175 years. "The County Appliance Ban has caused the present loss of would-be customers and threatens to erode its customer base through the permanent loss of new customers and existing customers over time. As a result, WGL's customer base will grow less than it would otherwise, resulting in higher rates for gas customers than they would have otherwise had." Ex. 8, Am. Donald "Blue" Jenkins Decl., ¶ 6. WGL has had conversations with business partners who have said they would want gas service from WGL if not for the County Appliance Ban. *Id.* at ¶ 7. WGL is also aware of "at least five Montgomery County construction projects that intend to use gas appliances with buildouts forecasted beyond 2026," and absent the County Appliance Ban, the company would anticipate similar growth in the future. *Id.* at ¶ 8. Additionally, "[b]y capping a portion of WGL's customer growth, the County Appliance Ban impedes [the company's] ability to spread the cost of new investment in maintaining the gas system, and instead concentrates those costs upon fewer and fewer customers than there otherwise would be. That results in increased rates than would otherwise occur for existing customers, who are forced to assume a greater share of the costs to maintain the gas system." *Id.* at ¶ 10. The result will be financial harm to and lower profits for WGL.

18. Plaintiff Philadelphia-Baltimore-Washington Laborers' District Council ("District

Council") is an affiliate of the Laborers International Union of North America ("LIUNA"), AFL-CIO, a 120-year-old labor organization with over 500,00 members throughout the United States and Canada. Ex. 9, Am. Ryan Boyer Decl., ¶ 2. The District Council has approximately 13,000 members, and nationally, one-third of construction work performed by LIUNA members is in the energy sector. *Id.* Local 11 represents approximately 800 workers who are laborers for utility construction contractors employed by WGL, such as NPL Construction and Skoda Contracting Company, 400 of whom regularly work in Montgomery County, Maryland. *Id.* at ¶ 3. Notably, District Council members who work on gas distribution lines are required to hold an operator qualification under Subpart G in 49 C.F.R. Part 195. *Id.* at ¶ 4. This valuable employment credential is applicable only to work on gas lines. *Id.* The County Appliance Ban—through its tamping down on the demand for gas now and in the future—will reduce the work performed by District Council members, leading to layoffs and the permanent loss of employment. *Id.* at ¶ 6. Furthermore, it will cause the gas industry in the local area to shrink, restricting District Council members' ability to find employment in the industry for which they have non-transferrable training and credentials. *Id.* Loss of their union employment would cause them to lose the ability to continue to earn valuable pension credits in union-sponsored pension plans. *Id.* Additionally, by calling into doubt the long-term future of gas-related trades, the County Appliance Ban makes those trades less attractive and likely is causing would-be gas workers to turn to other trades instead. *Id.* ¶ 8. That will only get worse when the County Appliance Ban becomes an approved regulation. *Id.* That translates in fewer members and weaker bargaining power for the District Council. *Id.* Also, many District Council local members are WGL customers. *Id.* at ¶ 7. The County Appliance Ban—both by causing some would-be gas customers to choose electricity instead and

then later, once it becomes an approved regulation, by outright prohibiting gas as an option for some customers—will limit the pool of gas customers, forcing existing gas customers like these local members to pay higher rates for gas service than they otherwise would pay. *Id.*

19. Plaintiff Teamsters Local 96 ("Local 96") is a union. Local 96 has approximately 600 members, all of whom are employed by Plaintiff WGL. Ex. 10, Am. Wilder Reed Decl., ¶ 3. As WGL employees, Local 96 members service the more than 240,000 WGL customers in Montgomery County, Maryland. *Id.* Among other things, Local 96 members conduct surveys of the existing gas infrastructure, replace and repair gas pipes, install gas lines, and read and install gas meters in customer's homes and businesses. *Id.* at ¶ 4. The County Appliance Ban—through its tamping down on the demand for gas now and in the future—will result in a decline of work performed by Local 96 members and will deprive Local 96 members of work. *Id.* at ¶ 6. The County Appliance Ban will therefore harm Local 96's members. *Id.* Also, by calling into doubt the long-term future of gas-related trades, the County Appliance Ban makes those trades less attractive and likely is causing would-be gas workers to turn to other trades instead. *Id.* ¶ 7. That will only get worse when the County Appliance Ban becomes an approved regulation. That translates in fewer members and weaker bargaining power for Local 96. *Id.* Additionally, the County Appliance Ban will require Local 96 to divert resources from its usual activities to providing its members with training to pursue new opportunities within their trade. *Id.* ¶ 6.

20. Defendant Montgomery County, Maryland is a charter county that adopted Montgomery County Bill 13-22.

21. An actual and substantial controversy has arisen and now exists between Plaintiffs and Defendant concerning the validity of Montgomery County Bill 13-22. Plaintiffs contend that the

County Appliance Ban is preempted by EPCA. Plaintiffs believe, and on that basis allege, that Defendant disagrees with Plaintiffs' contentions and assert that the appliance ban is lawful and enforceable. Enforcement of the appliance ban will injure Plaintiffs and/or their members. Those injuries will be redressed by a favorable ruling from this Court.

22. The claims asserted herein are ripe for review because Plaintiffs are being injured by Montgomery County Bill 13-22 and also will suffer further injury from it in the future. Plaintiffs challenge the facial validity of Montgomery County Bill 13-22, thereby raising a legal question. When a question is "predominantly legal," there is generally no need to await further factual development. *Pacific Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 201 (1983). There is no set of circumstances under which Montgomery County Bill 13-22 would be valid under federal law.

## ALLEGATIONS

**Montgomery County Bill 13-22's Ban on Federally Regulated Appliances**

23. Montgomery County Bill 13-22 sets into motion the process for banning the use of federally regulated appliances in new construction located in Montgomery County.

24. Specifically, Montgomery County Bill 13-22 requires the County Executive of Montgomery County to issue, by December 31, 2026 at latest, "all-electric building standards for new construction." Montgomery County Code § 8-14D. Then those regulations will be submitted to the County Council for approval. *See* Montgomery County Code §§ 2A-15, 8-14D.

25. "All-electric building" is defined as "a public or private building that contains no combustion equipment, or plumbing for combustion equipment, installed within the building or building site." Montgomery County Code § 8-14D. "Combustion equipment" is defined as "any

equipment or appliance used for space heating, service water heating, cooking, clothes drying and/or lighting that uses fuel gas or fuel oil." *Id.* This prohibits federally regulated gas appliances, which necessarily rely upon fuel combustion in their energy use.

26. "New construction" means "the construction of any new stand-alone building, with no remnants of any prior structure or physical connection to existing structures or outbuildings on the property." *Id.*

27. The Montgomery County Council adopted Montgomery County Bill 13-22 on December 2, 2022, and it was signed into law by County Executive Marc Elrich on December 12, 2022.

**EPCA Establishes National Binding Appliance Energy Regulations**

28. Montgomery County Bill 13-22 impermissibly regulates the energy use of gas appliances, which is an area that Congress directed the U.S. Department of Energy ("DOE") to regulate through the adoption of federal energy efficiency standards under EPCA. 42 U.S.C. § 6201 *et seq.*

29. EPCA was first passed in 1975 to create a comprehensive energy policy to address the serious economic and national security problems associated with our nation's continued reliance on foreign energy resources.

30. The original EPCA was designed to "(1) maximize domestic production of energy and provide for strategic storage reserves of crude oil, residual fuel oil and refined petroleum products; (2) . . . minimize the impact of disruptions in energy supplies by providing for emergency standing measures; (3) provide for domestic crude oil prices that will encourage domestic production in a manner consistent with economic recovery; and (4) reduce domestic energy consumption through the operation of specific voluntary and mandatory energy conservation programs." S. Rep. No. 94-516, at 116-17 (1975).

15

31. Since 1975, Congress has amended EPCA several times, progressively moving away from a laissez faire approach to appliance efficiency that relied upon consumers to choose more efficient appliances, and towards binding federal energy efficiency standards. Each amendment to EPCA further emphasized the federal government's intent to regulate appliance energy use and efficiency, and further limited states' abilities to set their own standards.

32. In its original form in 1975, EPCA's provisions regarding consumer appliances focused on requiring labeling of appliances, reasoning that consumers would choose more efficient appliances if they had access to accurate information about efficiency. Thus, the statute required manufacturers to label their appliances and provided that the Secretary of the Federal Energy Administration should utilize energy efficiency standards if the labeling program proved ineffective. The legislative history makes clear Congress's intent at the time: "it is the Committee's hope that voluntary efforts by manufacturers and better consumer information will make energy efficiency standards unnecessary; however, should the labeling program not suffice, energy efficiency standards should be utilized to achieve the goals of the legislation." H.R. Rep. No. 94-340, at 95 (1975).

33. Originally, EPCA permitted significant state involvement in appliance regulation. It allowed state regulations that differed from the federal regulations if the state regulations were justified by a substantial state or local need, did not interfere with interstate commerce, and were more stringent than the federal standard.

34. In 1978, Congress passed a range of statutes known as the National Energy Act ("NEA"), which gave the federal government broader authority over energy policy to ensure national security, decrease energy consumption, reduce dependency on energy imports, generate a strategic

petroleum reserve, and broadly develop reliable sources of energy for sustained economic growth. *See* Julia Richardson and Robert Nordhaus, *The National Energy Act of 1978*, 10 Nat. Res. & Env't 62, 62-63 (1995). President Carter also created the federal DOE in 1977 to coordinate a federal response to the nation's energy problems.

35.  One of these 1978 statutes passed as part of NEA was the National Energy Conservation and Policy Act ("NECPA"). NECPA amended the 1975 EPCA. Rather than relying exclusively on labeling, NECPA required DOE to prescribe minimum energy efficiency standards for certain products. NECPA also strengthened the preemption provisions in EPCA, allowing state regulations that were more stringent than federal regulations *only* if the Secretary found there was a significant state or local interest to justify the state's regulation and the regulation would not unduly burden interstate commerce.

36.  Despite the NECPA's new requirements, DOE did not initially adopt federal minimum energy standards. Instead, it "initiated a general policy of granting petitions from State requesting waivers from preemption. As a result, a system of separate State appliance standards ha[d] begun to emerge and the trend [was] growing." S. Rep. No. 100-6, at 4 (1987).

37.  In 1987, Congress responded by passing the National Appliance Energy Conservation Act ("NAECA"). The purpose of the NAECA amendment was "to reduce the regulatory and economic burdens on the appliance manufacturing industry through the establishment of national energy conservation standards for major residential appliances." S. Rep. No. 100-6, at 1 (1987).

38.  As the Senate recognized, varying state standards created "the problem of a growing patchwork of differing state regulations which would increasingly complicate [appliance manufacturers'] design, production and marketing plans." S. Rep. No. 100-6, at 4 (1987).

Similarly, the reports about NAECA in the House of Representatives make clear that Congress wanted to "end an era of confusion and uncertainty" for the industry and "to protect the appliance industry from having to comply with a patchwork of numerous conflicting State requirements." H.R. Rep. No. 100-11, at 24, 30 (1987).

39. Thus, NAECA contained "two basic provisions:" "[t]he establishment of Federal standards and the preemption of State standards." S. Rep. No. 100-6, at 2 (1987). "In general, these national standards would preempt all State standards." *Id.*

40. After NAECA, federal law provided two routes for a state or local jurisdiction to qualify for an exception to EPCA preemption. First, as mentioned above, DOE can grant a waiver of preemption; but while states could seek permission to establish their own standards, "achieving the waiver is difficult." S. Rep. No. 100-6, at 2 (1987). It would require showing an unusual and compelling local interest, and the waiver cannot be granted if the "State regulation is likely to result in the unavailability in the State of a product type or of products of a particular performance class, such as frost-free refrigerators." *Id.*

41. The second option to avoid preemption concerns consumer appliances, and it applies only to performance-based building codes for new construction. 42 U.S.C. § 6297(f). To qualify for this exception, the state code must meet a strict seven-part test, enumerated in 42 U.S.C. § 6297(f)(3). The House Report regarding NAECA explains that this exception is intended to "prevent[] state building codes from being used as a means of setting mandatory State appliance standards in excess of Federal Standards." H.R. Rep. 100-11, at 26. In addition, flexibility under this exception was "limited" to "ensure that performance-based codes cannot expressly or effectively require the installation of covered products whose efficiencies exceed . . . the applicable Federal standard . .

. ." *Id.* Congress intended to allow only "performance-based codes" that "authorize builders to adjust or trade off the efficiencies of the various building components so long as an energy objective is met." S. Rep. No. 100-6, at 10–11. To avoid preemption, among other requirements, a state building code provision must "establish 'credits' for various conservation measures, to provide, to the greatest degree possible, one-for-one equivalency between the energy efficiency of these differing measures and the credits provided for such energy efficiency." *Id.* at 11. The Senate chose this requirement "to assure that the credits for exceeding Federal standards are even-handed and are not unfairly weighted resulting in undue pressure on builders to install covered products exceeding Federal standards." *Id.*

42. In 1992, Congress amended EPCA once more through the Energy Policy Act of 1992. That amendment expanded the federal appliance program to include energy efficiency standards for industrial appliances as well as consumer appliances. Likewise, a pathway was added for a state building code regulation for new construction concerning industrial appliances to be exempt from preemption: the regulation must "not require that the energy efficiency of such product exceed the applicable minimum energy efficiency requirement in amended ASHRAE/IES Standard 90.1." 42 U.S.C. § 6316(b)(2)(B)(i).

43. Thus, in its present form, EPCA covers both consumer and industrial appliances, and it sets federal standards for the energy use and efficiency of those products.

**EPCA Expressly Preempts Regulation of Consumer and Industrial Appliances**

44. EPCA expressly preempts state/local regulation of appliance energy use and efficiency, with only narrow exemptions. The statute sets out specific requirements that must be met to qualify for one of these narrow exemptions. In other words, Congress meant to preempt the entire field of

energy use and energy efficiency of covered appliances, leaving DOE to set nationwide standards and establishing detailed conditions that state regulations must meet to avoid preemption.

45.  EPCA's energy use and efficiency regulations apply to "covered products." EPCA defines "covered products" for consumers as the types of products listed in Section 6292 of the Act. 42 U.S.C. § 6291(2). Section 6292 in turn lists 19 types of defined covered products, including "water heaters,"  "furnaces," and "kitchen ranges and ovens." *Id.* § 6292(a). Section 6295 sets out the energy conservation standards for these covered products.

46. EPCA defines a "consumer product" as one "(A) which in operation consumes, or is designed to consume, energy . . . and (B) which, to any significant extent, is distributed in commerce for personal use or consumption by individuals[.]" *Id.* § 6291(1). The definition of a consumer product is "without regard to whether such article of such type is in fact distributed in commerce for personal use or consumption by an individual . . . ." *Id.* In other words, products which are regularly sold to individuals may be classified as consumer products, regardless of whether a particular *unit* of the product has been purchased by an individual or by a business, and regardless of whether the products are used in a commercial building or a residential building. Some of the appliances regulated under Montgomery Bill 13-22 are considered "consumer products."

47.  The express preemption in EPCA's consumer product regulations states that as of "the effective date of an energy conservation standard established in or prescribed . . . for any covered product, no State regulation concerning the energy efficiency, energy use, or water use of such covered product shall be effective with respect to such product unless the regulation" falls within certain enumerated exceptions. *Id.* § 6297(c).

48. "Energy use" is defined as "the quantity of energy directly consumed by a consumer product at point of use . . . ." *Id.* § 6291(4). "Energy" is defined as "electricity, or fossil fuels." *Id.* § 6291(3).

49. Thus, EPCA's consumer standards preempt state regulations concerning the quantity of electricity or fossil fuels consumed by appliances (including water heaters and furnaces and gas stoves) which are regularly sold to individuals.

50. Similarly, EPCA also governs the energy efficiency and energy use of certain industrial appliances. *Id.* § 6311-17.

51. Like EPCA's consumer standards, the industrial standards explicitly "supersede any State or local regulation concerning the energy efficiency or energy use of a product for which a standard is prescribed or established" in the federal statute. *Id.* § 6316(b)(2)(A).

52. "Energy use," for the purposes of the industrial standards, is defined as "the quantity of energy directly consumed by an article of industrial equipment at the point of use. . . ." *Id.* § 6311(4). The definition of "energy" refers back to the definition in the consumer standards in Section 6291: energy is "electricity, or fossil fuels." *Id.* §§ 6311(7), 6291(3).

53. EPCA also prescribes standards for various types of "industrial equipment," including "commercial package air conditioning and heating equipment," "warm air furnaces," and several types of water heaters. *Id.* § 6311(2)(B). Those products are "industrial" rather than "consumer" if they are "distributed in commerce for industrial or commercial use" to "any significant extent." *Id.* § 6311(2)(A).

54. Thus, EPCA's standards for consumer products and industrial equipment preempt state and local regulations concerning energy use or energy efficiency of heating equipment, water

21

heaters, furnaces, and gas stoves which are regularly sold for residential, industrial, or commercial use.

**EPCA Preempts Montgomery County Bill 13-22**

55. EPCA preempts Montgomery County Bill 13-22 because Montgomery County Bill 13-22 expressly concerns the energy use of EPCA-covered gas appliances which are regularly sold for residential, commercial, or industrial use, as it bans the use of entire classes of such appliances in newly constructed buildings in Montgomery County.

56. Montgomery County Bill 13-22 concerns the quantity of natural gas consumed by appliances because it sets into motion the process for prohibiting the installation of EPCA-covered products. As a result, Montgomery County Bill 13-22 requires that, aside from limited exemptions, *no* natural gas is used by such products. Stated another way, these provisions effectively require that the quantity of natural gas used by EPCA-covered products is zero, when the national standards promulgated by DOE specify levels of energy efficiency that are based on different, non-zero levels of gas energy use by such covered products. As a result, EPCA preempts Montgomery County Bill 13-22.

57. For consumer appliances, a state or local regulation is exempted from preemption if it "is in a building code for new construction" and meets seven specific requirements. 42 U.S.C. §§ 6297(c)(3), (f)(3). The regulation is preempted unless it meets *all seven* of these requirements.

58. The seven requirements, taken together, are intended to allow only performance-based codes that give builders a choice about how to meet overall efficiency or conservation objectives, ensuring an even-handed policy that does not pressure builders to choose one type of appliance over another. *See* S. Rep. 100-6, at 10–11 (1987).

59. For new construction, the requirements are based on the typical structure of performance-based energy efficiency provisions in building codes, which establish overall energy efficiency or conservation measures for a building and specify different ways in which a builder or building owner can meet the required objectives.

60. Montgomery County Bill 13-22 does not meet all seven requirements listed in Section 6297(f)(3), and is thereby preempted. For example, the first requirement to avoid preemption is that "[t]he code permits a builder to meet an energy consumption or conservation objective for a building by selecting items whose combined energy efficiencies meet the objective." 42 U.S.C. § 6297(f)(3)(A). Montgomery County Bill 13-22 does not meet this requirement, because it does not set an "energy consumption or conservation objective for a building" that allows a builder to select items that, in combination, meet the objective. Instead, the builder cannot select *any* EPCA-covered gas appliance, no matter the energy use or efficiency of the appliance.

61. The second requirement is that "[t]he code does not require that the covered product have an energy efficiency exceeding the" federal EPCA standards in section 6295, absent a state waiver (which does not apply in this case). *Id.* § 6297(f)(3)(B). Montgomery County Bill 13-22 does not meet this requirement, because it requires the County Executive to issue regulations banning the use of EPCA-covered gas appliances that meet federal energy efficiency standards.

62. The third requirement is that "[t]he credit to the energy consumption or conservation objective allowed by the code for installing covered products having energy efficiencies exceeding [the federal EPCA standards in section 6295] is on a one-for-one equivalent energy use or equivalent cost basis." *Id.* § 6297(f)(3)(C). Montgomery County Bill 13-22 does not meet this requirement, because it does not give credit "on a one-for-one equivalent energy use . . . basis" for

products that are more efficient than the federal standards require. Instead, Montgomery County Bill 13-22 bans the use of EPCA-covered consumer products.

63.  The fifth requirement is that "[i]f the code sets forth one or more optional combinations of items which meet the energy consumption or conservation objective, for every combination which includes a covered product the efficiency of which exceeds [federal energy efficiency standards for consumer products], there also shall be at least one combination which includes such covered product the efficiency of which does not exceed such standard or level by more than 5 percent, *except that at least one combination shall include such covered product the efficiency of which meets but does not exceed such standard*." *Id.* § 6297(f)(3)(E) (emphasis added). Here, Montgomery County Bill 13-22 does not allow for any combination where builders can install EPCA-covered gas appliances that meet applicable EPCA efficiency standards.

64. Similar to the consumer product standards, EPCA contains only limited exemptions to the default rule of preemption of state regulations concerning the energy use or efficiency of industrial appliances. 42 U.S.C. § 6316(b)(2)(B).

65.  A state building code regulation for new construction is preempted if it "require[s] that the energy efficiency of such product exceed the applicable minimum energy efficiency requirement in amended ASHRAE/IES Standard 90.1" *Id.* § 6316(b)(2)(B)(i).

66. Montgomery County Bill 13-22 does not meet this requirement, because it  requires the County Executive to issue regulations banning EPCA-covered industrial appliances, even when they meet the efficiency standards in ASHRAE/IES Standard 90.1.

67. On information and belief, Montgomery County has not applied and cannot apply for a waiver from EPCA preemption from the U.S. Secretary of Energy, as would be required for an

exemption under 42 U.S.C. § 6297(d), because only states can apply for this waiver, and Montgomery County is not a state. However, even if Montgomery County could make such an application, it could not lawfully obtain such a waiver. EPCA prohibits the Secretary from granting a waiver where, as is the case here, "the State regulation is likely to result in the unavailability in the State of any covered product type (or class) of performance characteristics (including reliability), features, sizes, capacities, and volumes that are substantially the same as those generally available in the State at the time of the" waiver. *Id.* § 6297(d)(4).

## CAUSES OF ACTION

### COUNT ONE: FEDERAL PREEMPTION BY THE ENERGY POLICY AND CONSERVATION ACT

68. Plaintiffs re-allege the preceding paragraphs as though set forth fully herein.

69. Montgomery County Bill 13-22 concerns the energy efficiency and energy use of EPCA-covered consumer and industrial appliances in new construction.

70. Montgomery County cannot apply for a waiver from the U.S. Secretary of Energy to be exempt from EPCA preemption, because Montgomery County is not a state.

71. Montgomery County Bill 13-22 does not fall within the exemption to preemption in EPCA, including because, inter alia:

    a. It does not permit builders to select items whose combined energy efficiencies meet an objective for total energy consumption but rather bans EPCA-covered gas appliances;

    b. It does not give credit on a one-for-one basis for all appliances whose energy efficiency exceeds the federal standards, insofar as they ban the use of EPCA-covered gas appliances, no matter their efficiency; and

25

  c. It requires the County Executive to issue regulations banning EPCA-covered gas appliances, even when they meet the federal efficiency standards.

72. Montgomery County Bill 13-22 is therefore preempted by the federal EPCA.

73. There is no set of circumstances under which Montgomery County Bill 13-22 would be valid.

74. Plaintiffs accordingly request that the Court declare that Montgomery County Bill 13-22 is preempted by EPCA and enjoin Defendant from enforcing the preempted Montgomery County Bill 13-22.

## PRAYER FOR RELIEF

75. WHEREFORE, Plaintiffs pray for relief as follows:

76. For a permanent injunction enjoining Defendant from enforcing or attempting to enforce Montgomery County Bill 13-22;

77. For a declaratory judgment, pursuant to 28 U.S.C. § 2201(a) and § 1331, that Montgomery County Bill 13-22 is preempted by federal law because it concerns the energy use of appliances covered by the federal Energy Policy and Conservation Act and is therefore void and unenforceable.

78. For costs of this suit, including reasonable attorney's fees; and

79. For such other and further relief as the Court may deem just and proper.

Respectfully submitted,

BAKER BOTTS L.L.P.

/s/ Scott Novak
Jeffrey S. Wettengel (Bar ID: 20383)
Scott Novak (Bar ID: 31357)
700 K St NW
Washington, DC 20001
(P) 202-639-1333
(F) 202-508-9334
jeff.wettengel@bakerbotts.com
scott.novak@bakerbotts.com

J. Mark Little (*pro hac vice*)
910 Louisiana St
Houston, TX 77098
(P) 713-229-1489
(F) 713-229-2789
mark.little@bakerbotts.com

*Counsel for National Association of Home Builders
of the United States, Restaurant Law Center,
National Federation of Independent Business, Inc.,
Maryland Building Industry Association, National
Propane Gas Association, and Washington Gas
Light Company*


RESTAURANT LAW CENTER

/s/ Angelo Amador
Angelo Amador (*pro hac vice application
forthcoming*)
2055 L St NW
Washington, DC 20036
(P) 202-331-5913
(F) 202-331-2429
AAmador@restaurant.org
*Counsel for Restaurant Law Center*

LIUNA, MID-ATLANTIC REGION

/s/ Brian Petruska
Brian Petruska (Bar ID: 16916)
1875 Explorer Dr, Ste. 920
Reston, VA 20190
(P) 703-860-4194
(F) 703-860-1865
bpetruska@maliuna.org
*Counsel for Philadelphia-Baltimore-Washington Laborers' District Council*

MOONEY, GREEN, SAINDON, MURPHY & WELCH, P.C

/s/ Lauren McDermott
Lauren McDermott (Bar ID: 19371)
1920 L St NW
Washington, DC 20036
(P) 202-783-0010
(F) 202-783-6088
lmcdermott@mooneygreen.com
*Counsel for Teamsters Local 96*